

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

FEB 1 4 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Verizon account 530-919-9228

)
)
)
)
)
)

Case No. 2:20 - SW - 1 7 9   CKD

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A-9

located in the _____**EASTERN**_____ District of _____**CALIFORNIA**_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a) | Manufacturing Marijuana |
| 21 U.S.C. § 846 | Conspiracy to Manufacture Marijuana |

The application is based on these facts:

See Affidavit of Special Agent Cindy Yamasaki in Support of Search Warrant

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Cindy Yamasaki, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____02/14/2020_____

_____
*Judge's signature*

City and state:  Sacramento, California

Hon. Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF DEA SPECIAL AGENT
# CINDY YAMASAKI

I, Cindy Yamasaki, being duly sworn, hereby depose and state:

## Purpose

1. This Affidavit is made in support of an application for search warrants for historical cell site location information and other account information maintained by the cellular telephone provider for the following cellular telephone accounts:

   a. Verizon account 530-957-3606 associated with a black Samsung cell phone with IMEI#357092102126253, seized from Christopher Ross, as further described in Attachment A-1.

   b. Verizon account 530-599-0529 associated with a Nokia cell phone with IMEI#359019093223987, seized from Ramiro Morales, as further described in Attachment A-2.

   c. Verizon account 530-845-3799 associated with a Motorola cell phone with IMEI#351838092358412, seized from Ramiro Morales, as further described in Attachment A-3.

   d. Verizon account 530-317-7542 associated with a black and white Samsung cell phone d with IMEI#354640102394959, seized from Jorge Lamas, as further described in Attachment A-4.

   e. Verizon account 530-957-8264 associated with a black Samsung cell phone with IMEI#089875349505396856, seized from Brandi Kimberly, as further described in Attachment A-5.

   f. AT&T/Cricket account 276-252-2695 associated with a silver Apple iPhone, seized from a tent at 4740 Sand Ridge Road, Placerville, California, as further described in Attachment A-6.

g. Sprint account 530-870-3780 associated with a black and silver LG cell phone seized from a tent at 4740 Sand Ridge Road, Placerville, California, as further described in Attachment A-7.

h. Verizon account 530-620-8400 associated with an LG VS425LPP cell phone seized from the residence at 4740 Sand Ridge Road, Placerville, California, as further described in Attachment A-8.

i. Verizon account 530-919-9228 associated with a Samsung SM-S820L cell phone seized from the residence at 4740 Sand Ridge Road, Placerville, California, as further described in Attachment A-9.

I assert that there is probable cause to believe that the cellular telephones and cellular telephone accounts described in Attachments A-1 through A-9 contain evidence of violations of 21 U.S.C. § 846 and 841(a)(1) (conspiracy to manufacture marijuana); 21 U.S.C. § 841(a)(1) (manufacturing marijuana); 18 U.S.C. § 924(c) (use of a firearm during and in relation to a drug trafficking offense); and 18 U.S.C. § 922(g)(5) (unlawful alien in possession of a firearm). The evidence to be searched for and seized is more fully described in Attachment B.

## Agent Background

2. I am a Special Agent with the United States Drug Enforcement Administration (DEA) and have so been employed since December 2004. I was trained as a DEA Special Agent at the DEA/FBI Academy, Quantico, Virginia. During my training, I received special training in the Controlled Substance Act, Title 21 United States Code, including but not limited to, Sections 841(a)(1) and 846, Controlled Substance Violations and Conspiracy to Commit Controlled Substance Violations, respectively. I have received special training regarding criminal organizations engaged in conspiracies to manufacture and/or possess with intent to distribute methamphetamine, cocaine, cocaine base, heroin, marijuana, MDMA, and other dangerous drugs prohibited by law. I received further training in search and seizure law and many other facets of drug law enforcement. I have received specialized formal training in clandestine laboratory investigations and safety procedures during a forty hour course at the DEA Academy, Quantico, Virginia. This training involved, but was not limited to, clandestine laboratories, identification of chemicals and other hazardous materials used

in the manufacturing of methamphetamine, familiarization with equipment and apparatus used in the clandestine laboratory processing. I have also spoken to and worked with experienced federal, stated, and municipal narcotic officers regarding the methods and means employed by drug manufacturers and drug traffickers.

3. During the course of my employment as a DEA Special Agent, I have participated in numerous criminal investigations. I have participated in numerous Federal and State search warrants involving the aforementioned listed controlled substances, the seizure of narcotics-related records and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, various types of infiltration, including undercover agents, informants, and cooperating sources. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I am familiar with the methods used by drug traffickers to smuggle and safeguard controlled substances, to distribute, manufacture, and transport controlled substances, use cellular telephones, and to collect and launder related proceeds.

4. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

5. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested search warrants, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause.

6. This affidavit is based upon my own personal knowledge but also the knowledge of other law enforcement officers involved in this investigation. Where I describe statements made by other people (including other special agents and law enforcement officers), the statements are described in sum, substance, and relevant part. Similarly, where I describe information contained in reports and other documents or records in this affidavit, this information is also described in sum, substance, and relevant part.

# Statement of Probable Cause

*Private land owner leases land for marijuana cultivation operation.*

7. On July 1, 2019, Christopher Ross entered into a marijuana cultivation agreement with an individual he knew as "Jaime." As part of the agreement, Ross allowed "Jaime" and his associates to grow marijuana on Ross's property at 4740 Sand Ridge Road in Placerville, California. In exchange, Jaime promised to pay Ross $13,000. As some point, "Jaime" gave $2,000 in cash and a Jeep Cherokee valued at $8,000 to Ross. The balance of $3,000 was to be paid at the end of the marijuana cultivation season.

8. Beginning in September 2019, Juan Carlos Vasquez (aka "Paco") began living on the Sand Ridge Road property in a tent near the marijuana garden. Vasquez was in charge of cultivating the marijuana and maintaining security of the marijuana garden.

9. In early October, Ross saw Vasquez in the marijuana garden in possession of a firearm and became aware that Vasquez fired two rounds from the firearm while in the marijuana garden.

*Ross becomes concerned that his co-conspirators will not pay him.*

10. In mid-October, Ross, recognizing that the marijuana in the marijuana garden was nearly ready to harvest, became concerned that "Jaime" and his associates would not pay him the remaining $3,000 balance. Ross noticed that some of the marijuana tops had already been removed.

11. On October 20, 2019, Ross observed that a Hispanic male (later identified as Ramiro Morales) arrived on the property to assist with the cultivation and harvesting of the marijuana. Like Vasquez, Morales began living on the Sand Ridge Road property near the marijuana garden.

*Ross called 911 and provided false information.*

12. On October 23, 2019, at 12:25 a.m., Ross called 911 to report a "robbery." Ross told the 911 operator that, "I am a farmer . . . I grow marijuana." Ross claimed five people were up in "my grow site" taking his marijuana. Ross said that the people were also going onto his neighbor's property. While

4

talking with the 911 operator, Ross claimed that the people were actively in his marijuana grow with flashlights.

13. At no point did Ross tell the 911 operator that he knew that two people were living in the grow and that he had a business agreement with them. At no point did Ross tell the 911 operator that the people living in the grow were armed.

14. At 12:40 a.m., the 911 operator called Ross back to inform Ross that Sheriff's deputies were on their way to his property. The 911 operator asked if the robbers were still on his property and Ross said, "I'm sure they're still there." Ross provided the operator directions to the marijuana grow. Ross also told the 911 operator that he had seen a drone and that Ross believed that the drone was being used by the robbers for "keeping an eye on me."

15. At no point during this second call with 911 did Ross inform the 911 operator that he knew that two people were living in the grow and that he had a business agreement with them. And, at no point during this second call with 911 did Ross tell the 911 operator that the people living in the grow were armed.

### *Law enforcement officers respond to the false 911 call.*

16. In response to the 911 call, law enforcement officers from the El Dorado Sheriff's Office responded to Ross's property. Sheriff's deputies located the marijuana grow on Ross's property and identified themselves. Upon Sheriff's deputies identifying themselves as law enforcement officers, the Sheriff's deputies came under gun fire. One of the Sheriff's deputies was shot and killed. Another deputy was shot and wounded. Sheriff's deputies returned fire.

17. Shortly after the firefight between Sheriff's deputies and Ross's co-conspirators, and approximately 45 minutes after his first call to 911, Ross called back to 911. Ross told the 911 operator that it sounded like someone had tried to get into his house and that he had heard "probably like 50 shots" fired.

18. At no point during this third call with 911 did Ross inform the 911 operator that he knew that two people were living in the grow and that he had a business agreement with them. And, at no point during this third call with

911 did Ross tell the 911 operator that the people living in the grow were
armed.

## *Morales and Vasquez arrested after fleeing from the marijuana garden.*

19. Morales was taken into custody while fleeing away from the marijuana
garden. Morales was interviewed and admitted to arriving on the property
on October 20, 2019, to help cultivate and harvest the marijuana. Morales
told law enforcement that he had seen lights in the early morning of October
23, 2019 and told Vasquez that people were coming. Morales gave Vasquez a
firearm that Vasquez then fired at the Sheriff's deputies. During the gun
fight, Vasquez suffered a gunshot wound. Morales assisted Vasquez to flee
from the marijuana garden. Morales admitted to hiding the gun during their
flight. Morales was identified by his Mexican consular ID.

   a. The cellular devices identified in Attachments A-2 and A-3 were taken
   from Morales's person at the time of his arrest.

20. Vasquez was taken into custody while fleeing away from the marijuana
garden. Vasquez was interviewed and admitted that he was hired in
September to cultivate marijuana and protect the marijuana garden.
Vasquez admitted that he saw lights approaching the marijuana grow in the
early morning of October 23, 2019, and fired at least 15 rounds during the
gun fight. Vasquez said that the believed the lights belonged to people
coming to rob him. Vasquez did not have any form of identification.

## *Another 911 call by a member of marijuana conspiracy.*

21. Approximately five hours after the firefight at the Sand Ridge Road
marijuana garden, the El Dorado County Sheriff's Office 911 dispatch
received a 911 call from an individual using a cellular telephone who
identified himself as "Jorge." Jorge told the 911 operator that he only spoke
Spanish. A short time later, at 6:49 a.m., the 911 operator called Jorge back
and spoke to Jorge with the assistance of a Spanish-English translator.

22. Jorge told the operator that he believed that when he called 911, law
enforcement officers would come. Jorge did not know the address of where he
was located. Jorge said that he was at a marijuana ranch and thieves
starting shooting. Jorge said that he ran away when this happened. Jorge

6

said that he and another, unidentified person were paid to take care of the marijuana ranch. As the 911 operator was asking Jorge for more information, he hung up. Because Jorge could not identify the location of the marijuana ranch, the 911 operator was not sure if Jorge was referring to the earlier shooting at the Sand Ridge Road property or some other marijuana cultivation site.

23. At some point in the late night of October 22, 2019, or early morning of October 23, 2019, Lamas called Vasquez and Morales and alerted them that the Georgetown grow had been robbed.

24. Two days later, on October 25, 2019, the United States Marshals Service located and arrested Jorge in Yuba City, California. At the time of his arrest, Jorge had the cellular device identified in Attachment A-4 on his person. This cellular telephone was the same phone that had been used to call 911 on October 23. "Jorge" was further identified as Jorge Lamas by his California driver's license.

### *Jorge Lamas identified as fourth member of the conspiracy.*

25. After his arrest, Lamas was interviewed by law enforcement officers. Lamas admitted to participating in a marijuana cultivation conspiracy that was run out of Mexico. Lamas was paid $150 a day to supervise related marijuana cultivation operations divided into smaller marijuana gardens on rural private land. Lamas was paid by a person in Mexico.

26. Lamas admitted that he supervised Vasquez and Morales as part of the marijuana growing operation at 4740 Sand Ridge Road.

27. Lamas also identified a marijuana garden that he supervised located at 6646 Citabria Lane, Georgetown, California.

28. Lamas said that he lived at the house in Live Oak where he had been arrested (9735 N Street, Live Oak, California), however, he did not know the specific address of the house. Lamas said that he lived at the house with Vasquez, Morales, and another person involved in the manufacturing of marijuana named "Luis."

7

a. During his post-arrest statement, Ross told investigators that he communicated with an individual named "Luis" regarding the payment for the marijuana growing operation.

*Law enforcement officers search the Sand Ridge Road property and Citabria Lane property.*

29. After the firefight in the early morning of October 23, law enforcement officers searched the Sand Ridge Road marijuana garden. Law enforcement officers identified approximately 100 large, flowering marijuana plants in the Sand Ridge Road marijuana garden. The Sand Ridge Road marijuana cultivation operation was not in compliance with state and local rules and regulations related to marijuana cultivation. Marijuana is a Schedule I controlled substance.

   a. Law enforcement officers seized the cellular devices identified in Attachments A-6 and A-7 from the tent where Morales and Vasquez slept.

   b. Law enforcement officers seized the cellular devices identified in Attachments A-8 and A-9 from the residence were Christopher Ross lived.

   c. Law enforcement officers seized the cellular device identified in Attachment A-1 from Christopher Ross when he was arrested on October 23, 2019.

30. Also at the Sand Ridge Road property, law enforcement officers found a loaded, black Smith & Wesson Model 59 9mm pistol hidden in dense brush. The magazine contained four rounds of ammunition.

31. On October 26, 2019, law enforcement officers searched the marijuana garden on Citabria Lane in Georgetown. Law enforcement officers found 99 marijuana stalks that had been recently harvested and two live marijuana plants. The Citabria Lane marijuana cultivation operation was not in compliance with state and local rules and regulations related to marijuana cultivation.

32. Also at the Citabria Lane property, law enforcement officers found the box for the cellular telephone that Lamas used to call 911.

*Law enforcement officers interview Ross's girlfriend Brandi Kimberly.*

33. Brandi Kimberly is Christopher Ross's girlfriend.  Kimberly was interviewed regarding her knowledge of the marijuana growing operation at 4740 Sand Ridge.  Kimberly admitted that she previously resided at 4740 Sand Ridge with Ross but had moved out of the property.  Kimberly admitted that she was aware of the marijuana growing operation at 4740 Sand Ridge and that she had communicated about the marijuana growing operation with Ross. Kimberly said that Ross gave her the Jeep Cherokee that had previously been given to Ross by "Jaime."  The cellular telephone identified in Attachment A-5 was seized from Kimberly.

*Ross, Vasquez, Morales, and Lamas charged by indictment.*

34. On November 7, 2019, Ross, Vasquez, Morales, and Lamas were charged by indictment with conspiracy to manufacture marijuana, manufacturing marijuana, and discharge of a firearm during and in relation to a drug trafficking offense (2:19-CR-00192-MCE).  Vasquez and Morales were also charged with being an unlawful alien in possession of a firearm.

## Statement of Training and Experience

35. Based on my training and experience, and consultations with other federal, state and local law enforcement personnel, I believe the following to be true:

36. Based upon my training and experience, I know that some drug traffickers use cellular telephones and other electronic devices to communicate for a number of purposes related to their criminal activities.  I also know that, some drug traffickers use more than one cellular telephone or frequently change cellular telephones as a method to avoid identification by law enforcement.  I know through my experience with this investigation that members of the above-identified criminal conspiracy used cellular telephones to facilitate their drug trafficking operation.  Accordingly, based upon my training and experience, these co-conspirators used cellular telephones in furtherance of drug trafficking activities, I believe that the accounts related

to cellular telephones (Attachment A-1 through A-9) will contain evidence related to drug trafficking that are specifically identified in Attachment B, which is attached and incorporated herein.

37. A cellular telephone, or cell phone, is a mobile device that transmits and receives wire and electronic communications. Individuals using cell phones contract with service providers, who maintain antenna towers covering specific geographic areas. In order to transmit or receive calls and data, a cell phone must send a radio signal to an antenna tower that, in turn, is connected to a cellular service provider's network.

38. In addition to a unique telephone number, each cell phone has additional unique identifiers stored inside it. Depending upon the cellular network and the device, these will include, for hardware identification, an Electronic Serial Number ("ESN"), a Mobile Electronic Identity ("MEID"), or International Mobile Equipment Identity ("IMEI"); and for network identification, a Mobile Subscriber Identity or Identification Number ("MSID" or "MIN") and/or an International Mobile Subscriber Identifier ("IMSI"). Similarly, "smartphone" devices such as Android and iPhone devices contain unique device and account identities held by Google and Apple. When a cell phone connects to a cellular antenna or tower, it transmits its unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course. The unique identifiers—as transmitted from a cell phone to a cellular antenna or tower—are like the telephone number of an incoming call. They can be recorded by pen/trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content. The cell phone routinely transmits such identifiers for purposes of obtaining communications services.

39. Providers of cellular telephone service have technical capabilities that allow them to collect data that identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received radio signals from particular cell phones ("cell-site" location information). For each communication a cell phone makes, its cellular providers can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. Many

10

cell towers divide their coverage up into multiple sectors (most often three 120° sectors). Where this is the case, the provider can usually identify the sector of the tower that transmitted the communication. However, cell towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to the cell phone does not necessarily serve every call made to or from that phone. Accordingly, this cell-site information allows law enforcement to determine only the general location of a cell phone.

40. In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents. A cell phone can also be used to exchange text messages with email accounts.  Email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

///

///

///

///

///

///

///

///

///

# **Conclusion**

41. I hereby request that search warrants be issued for the above-mentioned cellular telephone accounts based upon the aforementioned facts.

42. Based upon the information set forth above, I submits that there is probable cause to believe that the items and information listed on Attachment B will be located in the items described in Attachments A-1 through A-9, and I request that search warrants be issued for those items.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Cindy Yamasaki
Special Agent, DEA

Sworn and Subscribed to me
on February 14, 2020,

Hon. CAROLYN K. DELANEY
United States Magistrate Judge

Approved as to form:

JUSTIN L. LEE
Assistant United States Attorney

# ATTACHMENT A-9

## *Item to be Searched*

Verizon account 530-919-9228 associated with a Samsung SM-S820L cell phone seized from the residence at 4740 Sand Ridge Road, Placerville, California, as further described in Attachment A-9.

# ATTACHMENT B

## *Item to be Seized*

This search warrant grants authority to seize all evidence of conspiracy to manufacture marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), use of a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c), and possession of a firearm by an unlawful alien, in violation of 18 U.S.C. § 922(g)(5), including:

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3. Local and long distance telephone  or other connection or session authentication records;

4. Call Detail Records to include but not limit to, cell sites, session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses and source port) associated with those sessions, voice, push to talk, non-content text message incoming and outgoing, SMS, MMS, data sessions, PCMD – Per Call Measurement Data, packet data activity records and any other stored records pertaining to packet data transmission;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Equipment Identifier ("MEID"), Mobile Station or Identification Numbers ("MSID" or "MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

7. Other subscriber numbers or identities (including the registration IP address or mobile operating system identities (e.g. Android or Apple device or account identity); and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

9. All other information associated with the identified cellular telephone account (including the contents of communications), including text messages, the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers), and including information regarding the cell towers and sectors through which the communications were sent or received.

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. |
| | ) | 2:20-SW-179  CKD |
| Verizon account 530-919-9228 | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____EASTERN_____ District of _____CALIFORNIA_____
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A-9

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____February 28, 2020_____
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
any duty magistrate judge_____ .
              *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
                                                                    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: ___2/14/2020___
                              1045

Judge's signature

City and state:     Sacramento, California          Hon. Carolyn K. Delaney, U.S. Magistrate Judge
                                                        *Printed name and title*

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subscribed, sworn to, and returned before me this date.

_____
*Signature of Judge*         *Date*

# ATTACHMENT A-9

## *Item to be Searched*

Verizon account 530-919-9228 associated with a Samsung SM-S820L cell phone seized from the residence at 4740 Sand Ridge Road, Placerville, California, as further described in Attachment A-9.

# ATTACHMENT B

## *Item to be Seized*

This search warrant grants authority to seize all evidence of conspiracy to manufacture marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), use of a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c), and possession of a firearm by an unlawful alien, in violation of 18 U.S.C. § 922(g)(5), including:

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3. Local and long distance telephone or other connection or session authentication records;

4. Call Detail Records to include but not limit to, cell sites, session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses and source port) associated with those sessions, voice, push to talk, non-content text message incoming and outgoing, SMS, MMS, data sessions, PCMD – Per Call Measurement Data, packet data activity records and any other stored records pertaining to packet data transmission;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Equipment Identifier ("MEID"), Mobile Station or Identification Numbers ("MSID" or "MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

7. Other subscriber numbers or identities (including the registration IP address or mobile operating system identities (e.g. Android or Apple device or account identity); and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

9. All other information associated with the identified cellular telephone account (including the contents of communications), including text messages, the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers), and including information regarding the cell towers and sectors through which the communications were sent or received.